UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


GARNER PROPERTIES &
MANAGEMENT,

                Plaintiff,                       Case No. 15-14100
                                                 Hon. Mark A. Goldsmith

vs.


CHARTER TOWNSHIP OF
REDFORD,

                Defendant.
_____/

## OPINION & ORDER
## GRANTING IN PART AND DENYING IN PART DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT (Dkt. 35)

       Plaintiff Garner Properties & Management brought this lawsuit to challenge Defendant

Charter Township of Redford's ordinances and the way those ordinances are applied. Garner

Properties had filed a motion for class certification (Dkt. 14), but this Court denied it without

prejudice in order to winnow the issues (Dkt. 31). Redford's motion for summary judgment

followed (Dkt. 35). This Court held a hearing on March 23, 2017. For the reasons stated below,

the motion is granted in part and denied in part.

## I.  BACKGROUND

       Garner Properties is a property management company that maintains and administers

rental properties owned by third parties. See Def. Statement of Material Facts ("SMF") ¶ 1, Def.

Br. at 1. Chris Garner is its only member. Id. ¶ 5. Twenty-five of its approximately 960 clients

have properties in Redford. Id. ¶ 3.

       Redford is a municipal corporation of the State of Michigan. Id. ¶ 2. It has adopted the

2000 version of the International Property Maintenance Code ("IPMC"), id., which is a widely used set of standards for real property repair and maintenance.[1]

In addition to the IPMC, Redford has adopted other ordinances regulating the operation of rental housing within its borders.  Id. ¶ 7; Compl. ¶ 17.  Violation of these codes is a strict liability offense.  See Compl. ¶ 22.

Redford requires non-owner occupied rental properties to undergo a preliminary inspection to determine whether the property is up to code.  See Def. SMF ¶¶ 9, 18.  An inspection requires the owner to pay a $200 inspection fee.  Id. ¶ 13.  After the owner requests an inspection, Redford's building department notifies the owner of the date and time of the inspection.  Id. ¶ 16.  A successful inspection — or an inspection that results in violations that ultimately are corrected — results in a "Certificate of Compliance," permitting the owner to rent the property to a tenant.  Id. ¶ 12.  A Certificate of Compliance is good for three years, after which time Redford requires another inspection.  Id. ¶ 13.

The owner or tenant need not admit the inspector to the property; but if he does not, the inspection does not occur.  Id. ¶ 17.  If the inspection does not occur, or if the owner refuses to correct any violations discovered during an inspection, a notice of "civil infraction" issues, and the owner must pay a $75 fine.  Id. ¶ 20.

If an inspection requires the owner to fix ordinance violations, a "rental inspection report" issues, which has references to code violations and provides for a 45-day period to remedy them.  Id. ¶ 19.  The inspector will then re-inspect the property, and he may impose a "discretionary re-inspection fee of $56."  Id. ¶ 14.  Failing to correct any violations following the

---

[1] Redford admits that, despite adopting the 2000 version, it has been enforcing either the 2006 or 2009 version for at least five years, see Pl. Resp. at 7 (Dkt. 38); Def. Reply at 1 (Dkt. 42); but Garner Properties does not identify any relevant differences between the different versions of the IPMC, see Pl. Resp. at 17.

re-inspection results in the $75 fine and civil infraction (also known as a notice of violation) noted above. Id. ¶ 20; see also Compl. ¶ 28. The same type of notice of violation issues if an inspection is refused.

The IPMC provides for the right to appeal the decision of a code official if a written appeal is filed within 20 days after the decision was issued. Def. SMF ¶ 25 (citing IPMC § 111.1 (2000)). Redford concedes that, prior to 2016, these reports did not contain information regarding the owner's right to appeal as required by the IPMC. Id. ¶ 19. There is no standing Building Board of Appeals in Redford, but Redford maintains that one can be assembled upon request and payment of a $500 fee. Id. ¶ 26.

If a Certificate of Compliance is not obtained within seven days of the assessment of the $75 fine, a second citation for $150 issues. See id. ¶ 21. If a Certificate of Compliance is not obtained within seven days of the $150 fine, a citation for $300 — which requires a court appearance — issues. Id. These fines are collected by the Township Treasurer, not the building department. Id. ¶ 22 (citing Pringle Dep. Tr., Ex. 2 to Def. Mot., at 96-98 (Dkt. 35-3)).[2] According to Plaintiff, the court hearing held in connection with the $300 fine is ministerial; the judge imposes liability if (i) the property is occupied but (ii) a Certificate of Compliance has not issued. See Garner Dep. Tr. at 75:21-76:7 (Dkt. 35-2). The district court does not permit discussion of why the Certificate of Compliance is lacking. Id.

Garner Properties raises a number of objections to this scheme. Primarily, it argues that Redford did not, in fact, provide any opportunity to appeal its code inspectors' decisions, thereby violating due process. It also argues that the rental inspection reports violated due process by

---

[2] Garner Properties' counter-statement of material facts purports to dispute this fact, claiming that Redford "has never provided proof of this allegation." See Pl. Resp. at 3. John Pringle's deposition testimony, however, is evidence of the asserted fact.

failing to include specific citations to the IPMC provisions that the inspector charged it with violating, and that the IPMC generally is void for vagueness.  Garner Properties also alleges that the inspections, which occurred without a warrant or other opportunity for pre-compliance review, violated the Fourth Amendment.  Finally, Garner Properties brings several related state-law claims.

## II.  STANDARD OF DECISION

On a motion for summary judgment, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts."  <u>Scott v. Harris</u>, 550 U.S. 372, 380 (2007).  "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." <u>Matsushita Elec. Industrial Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).

## III.  ANALYSIS

### A.  Plaintiff Has Standing

As noted above, Garner Properties has a contractual right to recoup fines, such as those imposed pursuant to Redford's ordinance and inspection schemes, from the actual owners of the property — although, as a show of goodwill to its clients, Garner Properties often declines to exercise this right.  Redford contends that this unexercised contractual right is effectively the same as money, such that Garner cannot claim to have suffered an actual monetary injury.  <u>See</u> Def. Br. at 8.

In making this argument, Redford cites no cases bearing on whether an unexercised contractual right to reimbursement for the alleged harm precludes standing.  <u>See</u> Def. Br. at 8-9. Even when there are no relevant facts in dispute, Redford, as the movant, still carries the burden of establishing that, as a matter of law, summary judgment is warranted.  <u>See</u> <u>Felix v. Young</u>,

536 F.2d 1126, 1135 (6th Cir. 1976) (denying summary judgment when, notwithstanding movant's unrebutted factual assertions, movant declined to argue underlying legal issue); see also Invitrogen Corp. v. Clontech Labs., Inc., 429 F.3d 1052, 1068 (Fed. Cir. 2005) ("[W]holly conclusory assertions on a legal issue cannot carry [the defendant]'s burden on summary judgment."); Massey v. Del Labs., Inc., 118 F.3d 1568, 1573 (Fed. Cir. 1997) ("Each party carries the burden on its own motion to show entitlement to judgment as a matter of law after demonstrating the absence of any genuine disputes over material facts."); Bingham, Ltd. v. United States, 724 F.2d 921, 924 (11th Cir. 1984) ("[E]ven if the material factual issues are not in dispute, they must furnish an adequate basis for the court to apply the proper legal principles in resolving a difficult question of law."). Redford has not carried its burden to prove that the legal issue should be resolved in its favor.

Moreover, upon its own review of governing case law, the Court concludes that Garner Properties does not lack standing. "[T]here can be no doubt that claims brought pursuant to § 1983 sound in tort." City of Monterey v. Del Monte Dunes at Monterey, Ltd., 526 U.S. 687, 709 (1999). "[W]hen the victim of a tort receives payment for his injuries from a collateral source, that is, a source independent of the tortfeasor, the payment should not be deducted from the damages owed by the tortfeasor." Ward v. Allied Van Lines, Inc., 231 F.3d 135, 139 (4th Cir. 2000); see also Markva v. Haveman, 168 F. Supp. 2d 695, 705 (E.D. Mich. 2001) ("The defendants have cited no authority to suggest that the Court may or should look to a collateral source when determining whether a party has suffered an injury in fact. There is, however, authority that suggests the contrary result." (citing Town of East Troy v. Soo Line R.R. Co., 653 F.2d 1123, 1132 (7th Cir. 1980))), aff'd, 317 F.3d 547 (6th Cir. 2003). And all of Redford's enforcement activities are directed to Garner Properties, as opposed to the properties' owners or

occupants, see Pl. Resp. at 10; whether Garner Properties has a means to offset its alleged losses from some other, wholly independent source is irrelevant.  Redford's standing argument is rejected.

### B.  Procedural Due Process

Garner Properties asserts that the following practices violated the IPMC and, in turn, Garner Properties' procedural due process rights:  (i) Redford's notices of violation did not specifically indicate which code provision formed the basis of the notice; (ii) notices of violation did not contain a statement advising its recipient of their right to appeal; (iii) Redford routinely ignored requests for appeal; and (iv) Redford, in fact, had no appeals board, despite the IPMC's alleged mandate that an appeals board be standing at all times.

Section 106.2 of the IPMC requires that Redford "shall serve a notice of violation . . . in accordance with [IMPC] Section 107."  See IMPC, Ex. A to Pl. Resp., § 106.2 (Dkt. 38-1). Section 107 requires, among other things, that a notice of violation explain "why [it] is being issued" and "[i]nform the property owner of the right to appeal."  Id. § 107.2(3), (5).  Garner Properties invokes both of these requirements, arguing that Redford's failure to comply with them violates procedural due process.

Redford first argues that its notices satisfied due process despite failing to include language advising recipients of their right to appeal.  See Def. Br. at 12.  Redford claims that, under controlling case law, the lack of a required appeal-rights notice is cured when the governing ordinance scheme — including its appeals scheme — is readily available from public sources.  See id. at 10-12 (citing City of West Covina v. Perkins, 525 U.S. 234 (1999); Shoemaker v. City of Howell, 795 F.3d 553 (6th Cir. 2015); Kennard v. City of Ashland, Ky., No. 12-28-HRW, 2015 WL 5194090 (E.D. Ky. Sept. 2, 2015)).

6

In West Covina v. Perkins, the plaintiffs claimed that the procedure for seeking the return of property (which had been seized during the execution of a search warrant) was unavailable to them because they were not provided adequate notice of the remedy and the information needed to invoke that remedy. 525 U.S. at 238. The Court rejected this argument, holding that when state-law remedies "are established by published, generally available" materials, failure to include a statutorily required notice does not offend due process because a person "can turn to these public sources to learn about the remedial procedures available to him." Id. at 241. The Court distinguished a similar case, Memphis Light, Gas & Water Division v. Craft, 436 U.S. 1 (1978) — in which utility customers' due process rights were violated when utility bills failed to inform the customers how to avoid having their services cut off — because, in that case, the procedures were "arcane and [were] not set forth in documents accessible to the public." West Covina, 525 U.S. at 242.

Similar to Perkins, the Sixth Circuit in Shoemaker held that a city's failure to comply with certain technical aspects of its own ordinance's notice requirements "does not automatically translate into a deprivation of procedural due process." 795 F.3d at 559. In that case, the defendant city failed to comply with its own rules concerning the contents of an ordinance-violation notice.[3] Nevertheless, because the Shoemaker plaintiff had received a partially

_____

[3] The ordinance in Shoemaker was required to contain the following details:

> [1] the time by which the alleged violator must appear at the [City of Howell Municipal Civil Infraction] Bureau, [2] the methods by which an appearance may be made, [3] the address and telephone number of the Bureau, [4] the hours during which the Bureau is open, [5] the amount of the fine scheduled for the alleged violation, and [6] the consequences for failure to appear and pay the required fine within the required time.

Shoemaker, 795 F.3d at 560. The notice sent to the Shoemaker plaintiff contained all but the final two details. Id.

compliant notice, which was "reasonably calculated, under all of the circumstances, to apprise [the plaintiff] of the pendency of the action and afford them an opportunity to present their objections," and because the notice "afford[ed] a reasonable time for those interested to make their appearance," the Sixth Circuit held that the inadequate notice did not deny the plaintiff his procedural due process rights. See id. at 560 (quoting Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 314 (1950)).

Responding to these authorities, Garner Properties first argues that the notice inadequacies are "alone" evidence of a due process violation. See Pl. Resp. at 13. It seeks to distinguish between the instant case — which involves a "pre-enforcement regulation" — and Shoemaker and West Covina, which involved "post-enforcement procedures." Id. Garner Properties makes the assertion that a pre-enforcement procedure "acts as a condition precedent to enforcement." Id. at 14.

But the bright-line distinction urged by Garner Properties is a false one; in deciding how much process is due, "pre- and postdeprivation processes should be considered together as a single package." Shoemaker, 795 F.3d at 559. There is certainly no rule that a municipality must strictly adhere to all pre-deprivation processes, however minor. In addition to analyzing post-deprivation procedures, Shoemaker examined the defendant city's violation of its pre-deprivation notice ordinance, yet excused the defendant's violation because the notice satisfied the due process guaranteed by the Constitution.

Notwithstanding whether there is any merit to Garner Properties' argument concerning the notices in isolation, Garner Properties survives summary judgment on its procedural due process claim when the package of pre- and post-deprivation processes are considered together.

First, Redford fails to show that there is no question of material fact as to whether its appeals scheme was "established by published, generally available" materials. See West Covina, 525 U.S. at 241. Rather, as Garner Properties points out, "the IPMC does not contain the procedures for the appeal," such as the proper form and/or fee, see Pl. Resp. at 17-18, so it is of little relevance whether the IPMC is easily available at the local library or online. Redford's website does not shed any light on an appeals process, either. See Ex. S to Pl. Resp. (Dkt. 38-19).

Redford claims that the appeal is initiated by completing an application to the Building Board of Appeals. See Def. Br. at 15 (citing Pringle Dep. Tr. at 86:3-5 ("Q. Okay. What is the Application? A. The application to go before the Building Board of Appeals.")); see also Appeal Applications, Ex. 6 to Def. Mot., at 8-9 (cm/ecf pages) (Dkt. 35-7). However, the Building Board of Appeals instructions do not appear relevant to contesting determinations that a property is out of compliance with the IPMC. According to the instructions, all appeals to the Building Board of Appeals "shall" contain a "description of the proposed variations or modifications the requirements of the Building Code." See Appeal Applications at 8 (cm/ecf page) (emphasis added). The same form goes on to require the owner's description of "the proposed building to be erected or altered." Id. (emphasis added). Neither of these provisions has anything to do with an ordinance violation appeal. Simply put, Redford's evidence of an available appeals process is relevant only to a completely different kind of appeal, and no reasonable person would dispute an alleged IPMC violation using the Building Board of Appeals form. Because Redford offers no other evidence of a readily ascertainable appeal mechanism, it is not entitled to summary judgment on this point.

A fact question also exists whether a diligent appellant's attempt at an appeal would succeed if directed to Redford in some other format improvised by the appellant. Garner Properties attempted to initiate at least four appeals by submitting letters to Redford, but received no response. See Garner Aff. ¶¶ 13-14, Ex. D to Pl. Resp. (Dkt. 38-4).

Chris Garner also notes that, in several verbal conversations with Redford employees concerning his desire to appeal, no one ever mentioned a specific appeal application or particularized process he should follow. See id. ¶¶ 17, 19-20. And Garner Properties attached a letter that Redford prepared "in response to the appeal request" of a different property management company, Pl. Resp. at 5, in which a Redford employee stated, "A board of appeals hearing can only pertain to certain zoning ordinance issues . . . . Violations of the building code can and will be addressed in civil court if civil fines are issued for non-compliance of violations [sic]." See 11/25/2015 Letter, Ex. I to Pl. Resp. (Dkt. 38-9).[4]

Thus, there is a fact question whether a general request for an appeal — submitted in the "wrong" manner, unbeknownst to the appellant — is met with silence rather than helpful guidance or correction. Contra Shoemaker, 795 F.3d at 560 ("A simple investigation of the referred-to Ordinances or a call to City Hall would have answered Shoemaker's questions, but he made no such effort."). In both West Covina and Perkins, the notices of violation comported with due process because they adequately put the recipient on notice that action was being taken against him; it was permissible to place the burden on the recipient to find out how to appeal,

_____

[4] On the same document, a different Redford employee admonished the original author: "Don't ever send a letter like this — the code provides for the appeals board if they desire." See 11/25/2015 Letter. In light of this admonishment, the November 25, 2015 letter is of neutral value in proving whether an appeals process existed. However, it does help to create a fact question whether the appeals process could be understood by reference to "published, generally available" materials and/or by contacting Redford directly.

then, because that was an achievable task. Here, Garner Properties has submitted evidence that it attempted to initiate the appeals process, but, in spite of its best efforts, it was unsuccessful.

In addition to these issues surrounding the notice of violation, similar considerations counsel that Redford is not entitled to summary judgment on the procedural due process claim generally (i.e., the whole package of procedures, including enforcement and appeal). The parties and this Court agree that Mathews v. Eldridge, 424 U.S. 319 (1976), establishes the four-part test that courts must apply to determine how much process is due. Under that test, courts inquire into the following:

> (1) the private interest that will be affected by the official action; (2) the risk of an erroneous deprivation; (3) the probable value, if any, of additional or substitute procedural safeguards; and (4) the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

Id. at 335. Courts must consider both pre- and post-deprivation processes together. Shoemaker, 795 F.3d at 559.

### 1. The private interest affected

Redford argues that Garner's private interest is "relatively minor." See Def. Br. at 13-14 (comparing Shoemaker, 795 F.3d at 561 ("$600 in fines and fees over 16 months . . . is relatively minor. . . . [Plaintiff] did not go hungry or lose his house because of the $600 added to his property taxes in fees and fines."), with Goldberg v. Kelly, 397 U.S. 254, 264 (1970) (welfare benefits providing means to food, clothing, housing, and medicine required pre-deprivation process)). Applying Shoemaker, Redford asserts that the fines imposed on Plaintiff were relatively minor because they do not deprive it of necessaries such as food and shelter. See id.

Garner Properties counters that, unlike the $600 fine in Shoemaker, which was unconnected to the plaintiff's livelihood, here, the repeated assessment of unreviewable fines

takes a significant toll on its business. See Pl. Resp. at 20-21 (quoting United Pet Supply, Inc. v

City of Chattanooga, 768 F.3d 464 (6th Cir. 2014) ("[A] person's means of livelihood is one of

the most significant that an individual can possess.")); see also Garner Dep. Tr. at 61:13-62:14

(describing how an unchallenged notice of violation could consume roughly half of one

property's yearly profit margin). Furthermore, the infirmities in the appeals process "deprives

[Garner Properties] of [its] right to appeal to the circuit court." Pl. Resp. at 19 (citing IPMC

§ 111.7 (establishing court review "following the filing" of the Board of Appeals' final

decision)).

    This Court agrees that the first Mathews factor tips in favor of Garner Properties. The

Shoemaker majority deemed $600 in fines to be insufficient to satisfy Mathews' first prong. 795

F.3d 561. Redford never argues that the sum of the fines that Garner Properties opposes

aggregate to something approximating $600 or less.[5] Rather, it argues that money, alone, is a

"relatively minor" private interest compared to "being prevented a means of access to food,

clothing, housing, and medical care." Def. Br. at 13. Redford purports to refute Garner

Properties' claim that these fines stand a very real chance of affecting its business, but Redford

only levies the conclusory charge that this, too, is a "relatively minor" concern. See id.

("Plaintiff also alleges a property interest in renting property and earning income from doing so.

But, these property interests are relatively minor" because "Plaintiff, as a corporation, is not

being prevented a means of access to food," etc.).

---

[5] In Shoemaker, the plaintiff was fined for his two separate infractions. Id. at 558 ("[T]he $600 total apparently includes $300 in fees ($150 for each grass-cutting service) and $300 in fines ($50 for the first infraction and $250 for the second)."). By considering the deprivation of $600, Shoemaker thus implies that it is the total amount of fines extracted by the allegedly unlawful scheme, rather than the amount of individual fines, that courts should consider.

Redford provides no authority for its position that a financial injury is, categorically speaking, a "minor" private interest, and <u>Shoemaker</u> only addressed the case-specific fact of a $600 injury not directly related to the plaintiff's livelihood. Based on the record, and putting aside the fact that this is a putative class action, it appears that Garner Properties is claiming far in excess of $600 — in fact, they allege that <u>each</u> wrongful denial of a certificate of occupancy can cost thousands of dollars. Pl. Resp. at 20 (citing Garner Aff.). Therefore, Redford did not meaningfully rebut Garner Properties' claim that it is challenging a not insignificant aggregate of fines, and that Redford's activity threatens the health of its business. This factor tips in favor of Garner Properties.

### 2. The risk of an erroneous deprivation

The "risk of an erroneous deprivation" factor asks whether the underlying official action — here, a code official's determination whether a property is in compliance with the IPMC — is constrained in a way that engenders accuracy and consistency, thereby reducing the need for additional processes. For example, in <u>Shoemaker</u>, the ordinance at issue was one that required grass to be kept shorter than eight inches tall. 795 F.3d at 561. When an official is faced with a bright-line, objective criterion, such as a yardstick measurement, or "elementary accounting," <u>see</u> <u>Sickles v. Campbell Cnty.</u>, 501 F.3d 726, 730 (6th Cir. 2007), this factor will tip in favor of the defendant.

Here, Redford simply states that, "[a]lthough the application of the IPMC at times requires some subjective interpretation by a code official, the IPMC also has many standards that are objective." Def. Br. at 14 (citing a single provision of the IPMC setting forth an objective, readily ascertainably standard). Redford's argument that there are subjective standards (along

with objective ones) is actually an acknowledgement that there are facets of the IPMC that pose a risk of erroneous deprivation.

In fact, according to John Pringle, the inspection supervisor in Redford's building department, "most of the IPMC" requires code inspectors to make subjective determinations. See Pringle Dep. Tr. at 60:18-21 (emphasis added). When faced with an example bearing a striking resemblance to the facts and rationale in Shoemaker, Pringle doubled down on his position that the IPMC is subjectively enforced. See id. at 60:22-25 ("Q. It's not as easy as them going out there and taking a measuring stick to some particular thing and going it's supposed to be six inches but really it's seven? A. Correct."). Garner also provided evidence, in the form of a sworn affidavit, that Redford routinely misapplies the IPMC. See Garner Aff. ¶ 11 (listing several examples). This factor favors Garner Properties.

### 3. The value of additional or substitute safeguards

On this issue, Redford's motion largely misses the point of Garner Properties' lawsuit. Redford's premise is that Garner Properties wants some processes in addition to a functioning appeals process. See Def. Br. at 15 ("Redford has an application for a Building Board of Appeals. Although there is no sitting board, Redford has the ability to quickly assemble it when needed."); see also id. at 16 (interpreting Garner's requested relief to include "an evidentiary hearing for every property maintenance code violation in Redford before the issuance of a violation or fine"); id. (defending the IPMC as sufficient to meet due process requirements, implying a belief that Garner Properties seeks processes not afforded by the IPMC). Garner's response clarifies that it merely asks for the processes ostensibly granted by the IPMC and Redford's own ordinances — not additional ones. See Pl. Resp. at 22. Because some form of post-deprivation process has value, and because Garner Properties has created a fact question

whether any post-deprivation process existed, this factor weighs strongly in favor of Garner Properties.

Additionally, Redford argues that Article VI, § 28 of the Michigan Constitution provides all the post-deprivation process that Garner Properties could want. Def. Br. at 15. As Garner Properties points out, however, this provision only provides judicial review of "final decisions, findings, rulings and orders of any administrative officer or agency," and Garner Properties' inability to get a decision on appeal means that there is no "final decision" for a court to review. See also IPMC § 111.7 (contemplating judicial review only after appeal decision rendered). Although the Michigan district court does order the payment of fines that Redford imposes for ordinance violations, Redford has not refuted Garner Properties' evidence that the district court does not provide an opportunity to contest the underlying violation.

### 4. How additional or substitute safeguards affect Redford's interest

Redford claims that the relief it thinks Garner Properties seeks — i.e., an evidentiary hearing for every ordinance violation — "would increase costs for Redford and add little procedural benefit." Def. Br. at 16. This argument is doomed for two reasons. First, as discussed in the preceding subsection, this is not the relief that Garner Properties seeks. Accordingly, the costs attached to such relief are irrelevant. Second, Redford provides no evidentiary support for its factual claim that such relief would be expensive.

### 5. Conclusion as to Mathews factors

Redford has failed to carry its burden to show that no issue of material fact exists as to whether it provided a package of pre- and post-deprivation remedies that, considered together, afford the level of procedural due process required by the Constitution. There are simply too many outstanding questions surrounding what processes Redford offered, when it offered them,

and whether and how a property owner could avail itself of those processes. Summary judgment is, therefore, denied.

## C. Prejudice

Redford argues that, in order to prevail on a procedural due process claim, a plaintiff must be able to show that he was prejudiced by the lack of process. <u>See</u> Def. Br. at 17. Indeed, the Sixth Circuit has stated:

> "[I]n order to prevail on a procedural due process challenge, [a plaintiff] must also show prejudice. Indeed, we need not address the merits of a claim if there is no demonstration of prejudice. Moreover, to establish the requisite prejudice, he must show that the due process violations led to a substantially different outcome from that which would have occurred in the absence of those violations."

<u>Graham v. Mukasey</u>, 519 F.3d 546, 549-550 (6th Cir. 2008).

According to Redford, Garner Properties failed to demonstrate that any alleged due process violations would, if remedied, lead to a substantially different outcome. <u>See</u> Def. Br. at 17. Redford claims that Chris Garner attended court hearings regarding ordinance violations, but pleaded "responsible to every violation on behalf of Garner Properties and has never withdrawn any such plea." <u>Id.</u> (citing Garner Dep. Tr. at 160-161). Further, says Redford, Chris Garner admitted that Garner Properties cannot establish that it and others would have prevailed if their appeals had been heard. <u>Id.</u> at 17-18 (citing Garner Dep. Tr. at 121, 135-136).

Garner Properties responds that, as a matter of law, prejudice is simply not required. It argues that <u>Graham</u>, as well as the cases on which it relied, relate to determinations regarding deportation of illegal aliens, and there is "no other reference in this country's jurisprudence" stating such a requirement. Pl. Resp. at 25. And even if there were, the cited portions of Garner's testimony did not amount to an admission that he can't establish whether he would

have prevailed; rather, he simply testified that he cannot know what would have happened in every case.  Id.

Notwithstanding whether a procedural due process claim requires a showing of prejudice to succeed, here, Garner Properties repeatedly claims that it was wrongfully cited for matters that did not actually violate the IPMC.  See, e.g., Garner Aff. ¶ 11 ("It is routine that we receive Redford's IPMC notices of violation that contain requirements to fix, repair, or replace items that are not covered by the IPMC or that are covered by the IPMC but have been applied to the property incorrectly.").  It also produced evidence showing that it attempted to appeal these incorrect assessments.  These facts, if believed, distinguish this case from Shoemaker; and, even assuming for purposes of this motion that such a requirement applies to due process claims, Garner Properties' evidence creates a fact question as to prejudice.

Garner's deposition transcript does not change this result.  Garner conceded that he admitted responsibility at all court hearings that he attended, see Garner Dep. Tr. at 160, but Garner Properties consistently has maintained that the "hearings" in question were ministerial enforcement proceedings, see, e.g., Compl. ¶ 38 ("Even then, the court is neither permitted nor in a position to inquire into the reason for the home owner's failure to obtain a certificate of compliance as it is a strict-liability offense as it pertains to the court"); see also Garner Dep. Tr. at 75:24-76:6.  These proceedings are not the merits-based appeal that a board of appeals would hear, or the merits-based inquiry that a circuit court would undertake in reviewing the board of appeals' decision.  And the testimony offered to prove that Garner conceded that he cannot know whether he would prevail was too abstract to operate as a concession of non-prejudice; Garner was simply saying that he could not predict whether a board of appeals would side with him on a

hypothetical case.  See Garner Dep. Tr. at 121:7-24, 135:6-136:8.  That line of questioning did not pertain to any particular dispute.

Accordingly, Redford has not carried its burden on summary judgment to show that there is no genuine dispute of material fact concerning prejudice, even assuming prejudice is a prerequisite to a procedural due process claim.

### D.  Void-for-Vagueness

Garner Properties' complaint highlights provisions of the IPMC setting forth what it terms "vague and uncertain standards," such as IPMC §§ 302.1 ("clean, safe and sanitary condition), 302.3 ("proper state of repair"), 302.7 ("sound and in good repair"), 304.6-.13 ("good repair").  Compl. ¶ 61.  The complaint asserts that such provisions are insufficient "to allow a person of ordinary intelligence to understand what is required to comply with the IPMC" and, when coupled with the provisions' grant of "unbridled discretion" to code officials, are void for vagueness.  Id. ¶ 62.

"A vague ordinance violates the Constitution in two significant respects: such an ordinance fails[ ] (1) to define the offense with sufficient definiteness that ordinary people can understand prohibited conduct, and (2) to establish standards to permit [the authority] to enforce the law in a non-arbitrary, non-discriminatory manner."  Belle Maer Harbor v. Charter Twp. of Harrison, 170 F.3d 553, 556 (6th Cir. 1999).  The second consideration is "the more important aspect of the vagueness doctrine."  Id. at 556-557.  In adjudicating a facial challenge, a court must first determine if the ordinance "reaches a substantial amount of constitutionally protected conduct," and if it does not, the plaintiff may only succeed if the enactment is vague in all applications.  Id. at 557.

Redford principally relies upon an unpublished case from the Northern District of Illinois holding that the IPMC, in particular, is not void for vagueness. <u>See</u> Def. Br. at 19-20 (citing <u>Mann v. Calumet City</u>, No. 08-cv-555, 2009 WL 395465, at *1 (N.D. Ill. Feb. 17, 2009)). <u>Mann</u> held that terms like "good repair" <u>are</u> defined in the IPMC, insofar as the IPMC ascribes to undefined terms their "ordinarily accepted meanings such as the context implies." <u>Id.</u> at *13-14 (quoting IPMC § 201.40). In <u>Grayned v. City of Rockford</u>, 408 U.S. 104, 110 (1972), which <u>Mann</u> cites, the Supreme Court stated that regulations need not achieve "mathematical certainty" or "meticulous specificity," and may instead embody "flexibility and reasonable breadth." <u>Mann</u> further cited a D.C. Circuit case and a Michigan Supreme Court case upholding regulations requiring properties to be maintained in "good repair." <u>See</u> <u>Mann</u>, 2009 WL 395465, at *14 (citing <u>Freeman United Coal Min. Co. v. Fed. Mine Safety & Health Review Comm'n</u>, 108 F.3d 358, 362 (D.C. Cir. 1997); <u>People v. Sarnoff</u>, 4 N.W.2d 544, 545-506 (Mich. 1942)). Moreover, "[g]enerally, there are far fewer 'good repair' regulations in the IPMC than there are specific, precise regulations . . . ." <u>Id.</u>

<u>Mann</u>'s discussion of the IPMC is coherent, exhaustively researched, and persuasive. This Court would be hard-pressed to improve upon its analysis, and it declines to attempt to do so. Vagueness doctrine is flexible, and it should not override common-sense understandings of words' meanings. Moreover, Defendant carried its burden on this purely legal issue, and Plaintiff did not cite a single on-point case in response. <u>See</u> Pl. Resp. at 25-27 (distinguishing the instant case from <u>Belle Maer Harbor</u>, which Redford cited, not for its factual applicability, but for its recitation of background legal principles). Accordingly, summary judgment is granted on this issue.

### E.  Fourth Amendment[6]

Redford employs a rental-property inspection scheme, under which someone who wishes to rent his property to someone else must first submit to an inspection to determine if the property is up to code.  Specifically, IPMC § 104.4 provides:

> Right of entry.  The code official is authorized to enter the structure or premises at reasonable times to inspect subject to constitutional restrictions on unreasonable searches and seizures. If entry is refused or not obtained, the code official is authorized to pursue recourse as provided by law.

If the occupant refuses an inspection, the inspection does not occur — but neither will a Certificate of Compliance issue, and fines begin to accrue.  No inspection occurs unless someone applies for a Certificate, and, although there is a fact question whether the inspection is scheduled with the input of the applicant, compare Garner Dep. Tr. at 47:22, with Pringle Dep. Tr. at 26:13-27:1, the parties agree that an applicant is notified of the scheduled inspection in advance.  Nothing in the record reflects any formal and/or written communication from Redford to an occupant regarding an inspection.  See also Garner Dep. Tr. at 47:18-22 ("[T]he building department notifies us of the inspection date and time.").  An occupant may not "back out" once the inspection process is initiated; a refusal definitely results in fines.  See IPMC § 104.4; Def. SMF ¶ 20.  One of Redford's exhibits charges Garner Properties with "fail[ing] to schedule the

---

[6] The parties disagree whether Garner Properties has an exclusive possessory interest in the property sufficient to confer standing on Garner Properties to raise a Fourth Amendment challenge to Redford's inspection requirement.  Garner Properties produced evidence raising a fact question on this point.  See Garner Aff. ¶ 6 ("As a property manager I have the right to the exclusive control and possession of the properties I manage, even to the exclusion of the owner, during the term of my contract."); see also Clapper v. Amnesty Int'l USA, 133 S. Ct. 1138, 1148-1149 (2013) (at summary judgment, affidavit setting forth specific facts can establish standing).  And, as a matter of common sense, it is readily conceivable (i) that property owners — wishing for an easy, hands-off income stream — relinquish all possession to Garner Properties during the contractual period; and (ii) that these properties do not have tenants at least some of the time.  Redford's standing argument is rejected.

required rental inspection"; the same document gives Garner Properties four days to correct the violation before citations issue. See 9/16/2015 Warning Notice, Ex. 4 to Def. Mot. (Dkt. 35-5).

Garner Properties asserts that this scheme violates the Fourth Amendment; the cited danger is stated as follows: "Refusal to consent to interior inspections is not permitted without the exaction of fines and penalties. Accordingly, Garner and thousands of others are forced to choose between consenting to a warrantless search or subjecting itself to fines and penalties for refusing entry and failing to obtain a certificate of compliance." Compl. ¶ 89. Its proposed remedy is that Redford be required to obtain a search warrant before Redford conducts an inspection.

"A facial challenge is an attack on a statute itself as opposed to a particular application." City of Los Angeles. v. Patel, 135 S. Ct. 2443, 2449 (2015). Although Garner Properties brings both facial and as-applied challenges, this Court need not address the as-applied challenge, as Garner Properties' facial challenge survives summary judgment. See City of Chicago v. Morales, 527 U.S. 41, 78 n.1 (1999) (Scalia, J., dissenting) ("[A] facial attack, since it requires unconstitutionality in all circumstances, necessarily presumes that the litigant presently before the court would be able to sustain an as-applied challenge.").

Whether the Fourth Amendment requires a full-blown warrant, or merely a less-onerous "opportunity for pre-compliance review" of the search, Garner Properties survives summary judgment on its Fourth Amendment claim. Redford's procedural protections for the subject of a search are inadequate even under the lower standard.

A search whose purpose is distinguishable from the general interest in crime control — such as the inspection at issue here — is termed an "administrative search." Patel, 135 S. Ct. at 2452. In such a case, and where "special needs make the warrant and probable-cause

requirement impracticable," it is permissible that no warrant ever be required. Id. But "in order for an administrative search to be constitutional, the subject of the search must be afforded an opportunity to obtain pre[-]compliance review before a neutral decisionmaker." Id. Pre-compliance review is a "minimal requirement." Id.

There are two types of administrative searches, each requiring different threshold showings from the searcher. On one hand are searches that take place in response to a specific complaint of lawbreaking. On the other are "routine" searches that take place as part of a generally applied administrative scheme. The first type of search presents a far greater opportunity for harassment by law enforcement; thus, a warrant may obtain for "routine" searches on the mere showing that the search is "on the basis of a general administrative plan for the enforcement" of a body of law. Marshall v. Barlow's, Inc., 436 U.S. 307, 321 (1978). Here, a code inspector would be protected from accusations of harassment by his ability to point to (i) the general scheme requiring inspections when a property owner applies for a Certificate, and every three years thereafter; and (ii) the specific property owner's decision to apply for a Certificate. This neutral scheme is likely sufficient for a warrant to issue.

Although the barriers to issuance of a warrant are extremely low in context, the warrant (or other opportunity for pre-compliance review) nevertheless must issue, so that there is something for the property owner to challenge in that rare case that a property owner suspects the inspector of overreaching.[7] In Barlow's, for instance, the bare-bones warrant at least provided

---

[7] The pre-compliance review contemplated by this case law does not include the general availability of the federal courts to hear Fourth Amendment challenges in an original action; such illusory "pre-compliance review" would be available in nearly every case. Rather, district courts are recognized as an avenue for pre-compliance review when they are identified as such by the body of law granting authority to perform the inspection. See, e.g., Barlow's, 436 U.S. at 321 ("The reasonableness of a warrantless search, however, will depend on the specific enforcement

the property's occupant with "assurances from a neutral officer that the inspection [i] is reasonable under the Constitution, [ii] is authorized by statute, and [iii] is pursuant to an administrative plan containing specific neutral criteria." Id. at 322. And in this case, one of Garner Properties' tenants allegedly objected to an inspection on the grounds that it had already occurred; despite the tenant's demand for evidence of the inspector's authority and purpose — which could have been evidenced, or not, by a warrant — the inspector illegally entered her home. See Harris Aff., Ex. K to Pl. Resp. (Dkt. 38-11).[8]

Courts in this circuit have reached the same conclusion in this very context. For instance, in Baker v. City of Portsmouth, No. 1:14CV5L2, 2015 WL 5822659 (S.D. Ohio Oct. 1, 2015), the plaintiff challenged an inspection scheme substantially similar to the instant case: property owners had to submit to inspection of premises before receiving permit to lease their property. The code limited the scope of the search to an 80-item checklist. Citing Camara and Patel, the court held that the city's failure to include any mechanism for pre-compliance review whatsoever was fatal. Id. at *7. And in Landon v. City of Flint, No. CV 16-11061, 2016 WL 7661390 (E.D. Mich. Nov. 30, 2016), report and recommendation adopted, No. CV 16-11061, 2017 WL 345854 (E.D. Mich. Jan. 24, 2017), the district court adopted the magistrate judge's recommendation that the IPMC, in particular, contained an unconstitutional inspection scheme for the same reasons advanced by Garner Properties.

By reference to the fact that inspections are initiated by the occupant and scheduled for a date roughly two weeks in the future, Redford claims that its inspections satisfy the requirement

---

needs and privacy guarantees of each statute. . . . Some statutes already envision resort to federal-court enforcement when entry is refused . . . .").

[8] Harris's affidavit is only cited as an illustration for the uses that a warrant or other opportunity for pre-compliance review might serve; it was not considered in evaluating Garner Properties' facial challenge.

for pre-compliance review.  <u>See</u> Def. Br. at 26 ("[O]wners and tenants have the opportunity for precompliance review of inspections.  Specifically, a request for an inspection is made by the owner to Redford and an inspection date is set up in advance.  If an owner or tenant does not permit an inspector access to a property, the inspector will not perform the inspection.").  Redford also argues that any constitutional problem is solved because, after any fine is issued, "the owner or tenant may contest the civil infraction at a court hearing before a judge."  <u>Id.</u>

This Court disagrees.  Redford points to no facts indicating how the delay between applying for a Certificate and the inspection itself provides some protection to the occupant who wishes to satisfy himself that the search will be within the Constitution's limits.  And the fact that the inspections are initiated by the occupant, who retains the right to refuse entry to the inspector, is irrelevant.  This "right" is illusory, because the whole point of pre-compliance review is to permit an objecting property owner some modicum of judicial protection before his property is invaded.  <u>See</u> <u>Patel</u>, 135 S. Ct. at 2452-2453.  The constitutional problem is not solved on the theory that the property owner can simply refuse the inspection; that carries serious consequences, including fines.  <u>See</u> Def. Br. at 26.  A process that permits a judicial challenge only after fines have been incurred puts a property owner to a constitutionally unacceptable choice of having to either allow the inspection to proceed, or refuse inspection and hope that a challenge to the scope and conditions of the proposed inspection is later upheld and all fines are returned or invalidated.  <u>See</u> <u>Patel</u>, 135 S. Ct. at 2452-2453 ("A hotel owner who refuses to give an officer access to his or her registry can be arrested on the spot. . . .  [B]usiness owners cannot reasonably be put to this kind of choice.") (citing <u>Camara</u>, 387 U.S. at 533 ("[B]road statutory safeguards are no substitute for individualized review, particularly when those safeguards may only be invoked at the risk of a criminal penalty.")).

Additionally, Redford argues that, as a matter of practice, it does not conduct warrantless inspections; it has never had to resort to obtaining a warrant; and Garner Properties can point to "only one incident" of its inspectors entering a tenant's property against her will.  See Defs. Br. at 26-27.  These arguments appear only to challenge Garner Properties' as-applied challenges to the ordinance, rather than its facial challenges.  See Patel, 135 S. Ct. at 2449 ("A facial challenge is an attack on a statute itself as opposed to a particular application.").  The record reflects, however, that Redford regularly conducts its inspections without a warrant or other opportunity for an occupant to obtain assurances regarding the scope of the search.  And its claim that it has never had to resort to obtaining a search warrant is puzzling in light of its admission that the record contains evidence of one of its inspectors forcing his way past an occupant who objected to the inspection.  Based on these questions of fact, this Court rejects whatever legal argument Redford is trying to make here.

Redford further states that the IPMC's dictate that inspectors' authority is "subject to constitutional restrictions on unreasonable searches and seizures" immunizes the provision from facial challenges.  Def. Br. at 26.  This prophylactic statement, however, is too vague and broad to have any recognizable legal force; it is nothing more than a tautology, stating the ever-present fact that all laws and officials' conduct are, in the end, subject to the Constitution.  And it must be considered in context with what else the provision authorizes, according to Redford's own interpretation:  An inspector may enter the premises without furnishing the required opportunity for pre-compliance review.  See also Camara, 387 U.S. at 538 ("It is obvious that 'probable cause' to issue a warrant to inspect must exist if reasonable legislative or administrative standards for conducting an area inspection are satisfied with respect to a particular dwelling.").

Finally, Redford points to <u>Harris v. Akron Department of Public Health</u>, 10 F. App'x 316, 318 (6th Cir. 2001), in which a rental inspection ordinance was held constitutional. <u>See</u> Def. Br. at 25. <u>Harris</u> is distinguishable. In that case, no penalty could be assessed until a notice and service of a Housing Code Order on the property owner prior to inspection; and the ordinance permitted the owner to contest the Order by seeking a hearing and an appeal as of right with the housing appeals board and, thereafter, judicial review. <u>Harris</u>, 10 F. App'x at 319.

As stated above, the IPMC, as adopted by Redford, authorizes a code inspector to enter one's property without a warrant or other method by which an occupant can contest the entry or learn the limits of the search. Refusal is met with a fine, and Redford's actions can only be contested after the fact.

For these reasons, Redford has not shown that it is entitled to summary judgment on Garner Properties' Fourth Amendment claim.

### F. Substantive Due Process

Redford asserts that the list of fundamental rights protected by the substantive due process doctrine is short, and that a "protected property interest in renting property and earning income from doing so" is not among them. <u>See</u> Def. Br. at 21 (quoting Compl. ¶ 67).[9] Garner Properties, citing no specific on-point law, does not meaningfully respond to this argument. <u>See</u> Pl. Resp. at 27-28 (arguing that business is a "<u>substantial</u> right" (emphasis added)).

If a statute does not implicate a fundamental right, the court conducts a rational basis review and asks whether the statute "is rationally related to legitimate government interests." <u>Does v. Munoz</u>, 507 F.3d 961, 964 (6th Cir. 2007). Protecting the public's health and safety

---

[9] Given the preceding Fourth Amendment analysis, which concluded that Redford has not shown an absence of material fact as to whether its inspection scheme is facially unconstitutional, Redford's motion for summary judgment is denied as to Garner Properties' substantive due process claim brought under the Fourth Amendment (Count Three).

passes the rational basis test.  Id. (citing Church of the Lukumi Babalu Aye v. City of Hialeah, 508 U.S. 520, 538 (1993); Neinast v. Bd. of Trs. of Columbus Metro. Library, 346 F.3d 585, 592 (6th Cir. 2003)).  Redford has carried its burden on this legal issue, and Garner Properties provides no reason to doubt the correctness of Redford's legal theory.  Nor can this Court think of any reason to doubt it.  Accordingly, Redford's ordinance enforcement scheme does not offend substantive due process; this claim is dismissed with prejudice.

### G.  Governmental Immunity

Redford argues that Michigan's governmental-immunity statutes insulate it liability.  See Def. Br. at 29.  As Redford concedes, this argument is only available as to Garner Properties' state-law tort claims; a state cannot enact a statute that insulates itself from liability under federal law.  See, e.g., Mack v. City of Detroit, 649 N.W.2d 47, 52 (Mich. 2002).

A governmental agency is immune from tort liability "if the governmental agency is engaged in the exercise or discharge of a governmental function." Mich. Comp. Laws § 691.1407(a).  A governmental agency includes a municipal corporation, such as Redford.  See Mich. Comp. Laws §§ 691.1401(a), (e).  A governmental function is "an activity that is expressly or impliedly mandated or authorized by . . . ordinance or other law." Mich. Comp. Laws § 691.1401(b).

Redford's entire argument that it is entitled to governmental immunity is confined to one sentence:  "The implementation and enforcement of a building code is a governmental function and is an activity authorized by law."  Def. Br. at 29 (citing Rakowski v. Sarb, 713 N.W.2d 787, 794 (Mich. Ct. App. 2006); Mich. Comp. Laws § 117.4l; Mich. Comp. Laws § 117.4q; Mich.

Comp. Laws § 125.1508b).[10]  Redford's briefing on this point normally would be woefully

inadequate, but it is not Redford's burden to show that government immunity applies.  Rather,

when suing a governmental unit, a plaintiff must plead in avoidance of governmental immunity

"by stating a claim that fits within a statutory exception or by pleading facts that demonstrate that

the alleged tort occurred during the exercise or discharge of a nongovernmental or proprietary

function."  Mack, 649 N.W.2d at 57; see also Fairley v. Dep't of Corr., 871 N.W.2d 129 (Mich.

2015); Olsen v. Cnty. of Muskegon, No. 233258, 2002 WL 31934158, at *1 (Mich. Ct. App.

Nov. 19, 2002) (recognizing Mack's holding that a court may "raise the matter of immunity sua

sponte"); 18 Mich. Civ. Jur. Mun. Corps. § 353 ("The six statutory exceptions to governmental

immunity are the highway exception, the motor vehicle exception, the public building exception,

the governmental hospital exception, the proprietary function exception, and the sewage system

event exception." (citing statutes)).

       Garner Properties' complaint does not plead in avoidance of governmental immunity.[11]

None of the five statutory exceptions to immunity is invoked.  The complaint makes a

---

[10] Mich. Comp. Laws § 117.4l empowers a city to "adopt an ordinance that designates a violation of the ordinance as a civil infraction and provides a civil fine for that violation."  Garner Properties does not challenge the fact that Redford enforces its ordinances via civil infraction and fine.  Mich. Comp. Laws § 117.4q empowers cities to "establish an administrative hearings bureau to adjudicate and impose sanctions for violations of the charter or ordinances designated in the charter or ordinance as a blight violation." (Emphasis added.)  Redford has not established that it has designated IMPC violations as blight violations.  Finally, Mich. Comp. Laws § 125.1508b states that cities "may by ordinance assume responsibility for administration and enforcement of" the Derossett-Hale Single-State Construction Code Act, and the statute further outlines some procedural guidelines for such cities.  Redford has not established that it has "by ordinance assume[d]" this responsibility.

[11] Garner Properties' response to Redford's motion, ignoring the motion's self-imposed limitation to the state-law claims, argues that Michigan's governmental immunity statute cannot apply to its federal constitutional claims.  See Pl. Resp. at 34-35.  The response, therefore, had no value in helping this Court discern whether Garner Properties pleaded in avoidance of governmental immunity for the state-law tort claims.

speculative hint at the nongovernmental/proprietary-function exception, however, describing Redford as follows:

> Redford and its Code Officials . . . are driven by profit making rather than a legitimate governmental interest in preserving and protecting the safety and welfare of occupants of rental housing. Redford's true and desired purpose is to set up Garner and other property managers and homeowners to fail so it can issue tickets with fines that cannot be meaningfully contested in court in order to generate funding to finance their cash-strapped municipality.

Compl. ¶ 118 (emphasis added).

The non-governmental/proprietary-function exception provides, in part, as follows:

> The immunity of the governmental agency shall not apply to actions to recover for bodily injury or property damage arising out of the performance of a proprietary function as defined in this section. Proprietary function shall mean any activity which is conducted primarily for the purpose of producing a pecuniary profit for the governmental agency, excluding, however, any activity normally supported by taxes or fees.

Mich. Comp. Laws § 691.1413. In other words, "[t]wo tests must be satisfied: The activity (1) must be conducted primarily for the purpose of producing a pecuniary profit, and (2) it cannot be normally supported by taxes and fees." Coleman v. Kootsillas, 575 N.W.2d 527, 530 (Mich. 1998). If Garner Properties fails to establish a fact question on either of these two tests, then Redford's ordinance enforcement operation is not a proprietary function, and it is entitled to governmental immunity from state-law tort liability. See, e.g., Totsky v. Henry Ford Hosp., 425 N.W.2d 531, 534 (Mich. Ct. App. 1988) (declining to reach second, "taxes and fees" test after concluding that "pecuniary profit" test not satisfied).

To determine whether the activity is conducted primarily for the purpose of producing a pecuniary profit, courts look to whether a profit is actually produced and, if so, where the profit is deposited and how it is spent.  Id.[12]

As noted above, Garner Properties' complaint is framed in speculative terms, lacking any factual allegations tending to show a profit-making purpose behind Redford's ordinance enforcement and inspection scheme.  Neither does Garner Properties identify any record evidence creating a fact question whether the building department generates a profit, or whether its revenue was "deposited in a general fund or used on unrelated [city agencies]."  See Transou v. City of Pontiac, 769 N.W.2d 281, 283 (Mich. Ct. App. 2009).[13]  Having failed to establish a profit motive behind the building department's operations, Garner Properties has not avoided governmental immunity.

---

[12] Despite the general rule that avoidance of governmental immunity is a pleading requirement, Michigan courts consistently consider the record evidence when evaluating whether the proprietary-function "exception" applies.  See, e.g., Goodhue v. Dep't of Transp., ___ N.W.2d ___, No. 332467, 2017 WL 2131518, at *2 (Mich. Ct. App. May 16, 2017) (relying upon agency director's testimony); Coleman, 575 N.W.2d at 530 ("The financial records establish that . . . ."); see also Mack, 649 N.W.2d at 57 (grouping the proprietary-function exception separately from "statutory exception[s]").  This is likely because a proprietary function "is the antithesis of a governmental function itself.  That is, as statutorily defined, the proprietary function exception means that an activity is not a governmental function."  Harris v. Univ. of Mich. Bd. of Regents, 558 N.W.2d 225, 231 (Mich. Ct. App. 1996) (emphasis in original).  This fact, however, does not relieve the plaintiff of his burden to show that immunity does not apply.  See, e.g., Mack, 649 N.W.2d at 57; see also Goodhue, 2017 WL 2131518, at *3 (affirming grant of summary disposition to defendants because there was "no evidentiary support for the contention that the primary purpose in running an efficient international bridge crossing is to improve the financial bottom line of any other government").

[13] There is evidence that the fines and fees associated with Redford's building department are deposited in Redford's treasury, rather than with the building department itself.  See Pringle Dep. Tr. at 98-99.  However, if this were enough to change the result, Redford would have no protection from the proprietary-function exception:  all payments to Redford are routed through the treasury in this way.  See id. at 98:16-18 (taxes, water, and "everything else" deposited with treasury).  Furthermore, there is no cited evidence whether the funds deposited with the treasury go to some general fund or other agency, versus being earmarked for the building department.

Although this Court need not reach the issue in light of the foregoing, examination of the other prong of the proprietary function — whether an ordinance scheme may <u>normally</u> be supported by taxes and fees — likewise counsels that this exception to governmental immunity is unavailable to Garner Properties.  "When deciding whether an activity satisfies the second part of the proprietary function test, it is important to consider the type of activity under examination."  <u>Coleman</u>, 575 N.W.2d at 530 (city's garbage collection operation not one that is normally supported by taxes and fees when garbage was also collected from neighboring cities). Garner Properties furnishes no argument or evidence that a typical agency enforcing health and safety ordinances within its city's borders is not typically supported by taxes and fees, or that the scope of Redford's building department's work is atypical in some way.

Accordingly, governmental immunity applies, and Garner Properties' state-law tort claims, including abuse of process and malicious prosecution, are dismissed.  Assumpsit and unjust enrichment do not sound in tort, however, so this Court must address them separately. <u>See</u> <u>Nelson & Witt v. Texas Co.</u>, 239 N.W. 289, 291 (Mich. 1931) ("At common law one might waive tort and sue in assumpsit . . . ."); <u>Anti-Kalsomine Co. v. Grove</u>, 78 N.W. 467, 467 (Mich. 1899) ("When a declaration, whether in tort <u>or</u> in assumpsit, . . . sets out a cause of action . . ." (emphasis added)); <u>In re Bradley Estate</u>, 835 N.W.2d 545, 568 (Mich. 2013) (Cavanagh, J., dissenting) ("[U]njust enrichment . . . sounds in neither contract nor tort, yet it shares characteristics of both."); <u>Pomann, Callanan & Sofen, P.C. v. Wayne Cnty. Dep't of Soc. Servs.</u>, 419 N.W.2d 787, 789 (Mich. Ct. App. 1988) ("[U]njust enrichment . . . sounds in quasi-contract, or contract implied-in-law.").

**H. Assumpsit**

According to Redford, "the remedy to recover illegal taxes paid is in assumpsit for money had and received." Def. Br. at 31 (quoting Serv. Coal Co. v. Unemployment Compens. Comm'n, 53 N.W.2d 362, 364 (Mich. 1952)). Without defining the term "illegal taxes," Redford concludes that "there is no evidence that any fees collected from [Garner Properties] by Redford were illegal," because "Redford provided adequate due process" to Garner Properties. Id. As set forth above, however, Redford has not proved that it is entitled to summary judgment on the due process issue, so its premise is flawed, and its argument is rejected.

Redford also points to the fact that Chris Garner conceded that he has not prevailed in any of the ministerial district court actions. Id. at 31-32. Although this fact might preclude a malicious prosecution claim, it is irrelevant to whether something illegal or inequitable occurred for other purposes; Garner Properties has created a fact question whether the district court proceedings are forums in which the merits of Redford's actions may be challenged.

That said, "in 1963, assumpsit as a form of action was abolished" in Michigan. Fisher Sand & Gravel Co. v. Neal A. Sweebe, Inc., 837 N.W.2d 244, 256 (Mich. 2013). But see id. ("[T]he substantive remedies traditionally available under assumpsit were preserved."). Accordingly, the claim of assumpsit — insofar as Garner Properties pleaded it as an independent cause of action — is dismissed. To the extent Garner Properties prevails at trial, it may be entitled to remedies that were previously available under assumpsit.

**I. Unjust Enrichment**

Redford's argument in opposition to Garner Properties' unjust enrichment claim is without merit. Redford states that, to state a claim for unjust enrichment, Garner Properties must prove "(1) receipt of a benefit by the defendant from the plaintiff and (2) an inequity resulting to plaintiff from defendant's retention of the benefit." Def. Br. at 31 (quoting Bellevue Ventures,

Inc. v. Morang-Kelly Inv., Inc., 836 N.W.2d 898, 901 (Mich. Ct. App. 2013)). Redford then concludes, without elaboration, that "[t]here is no evidence of any inequity resulting from the imposition of fines on [Garner Properties]." Id. Perhaps if Redford succeeded in obtaining summary judgment on the remainder of Garner Properties' claims, this conclusory statement would be sufficient. But with several claims surviving summary judgment, see supra, the bare statement that "there is no evidence of any inequity" is insufficient to meet Redford's burden. Summary judgment is denied on this issue.

**J. Malicious Prosecution**

Malicious prosecution is a cause of action cognizable under both Michigan common law and the Fourth Amendment.[14] As noted above, it is unavailable to Garner Properties under state law because Redford is entitled to governmental immunity. In either forum, however, a plaintiff must show, among other things, that the proceedings were resolved in his favor. See Sykes v. Anderson, 625 F.3d 294, 308-309 (6th Cir. 2010); Peterson Novelties, Inc. v. City of Berkley, 672 N.W.2d 351, 363 (Mich. Ct. App. 2003).

Redford argues that, according to Chris Garner's own testimony, no proceedings have terminated in Garner Properties' favor. Specifically, alleges Redford, "Garner appeared at formal hearings on behalf of Plaintiff after citations were issued, all of which were resolved against Plaintiff." Def. Br. at 29 (citing Garner Dep. Dr. at 69); see also id. at 30 (making the same point as to Garner Properties' state-law malicious prosecution claim).

Garner Properties disputes this factual claim. See Pl. SMF ¶ 24; Pl. Resp. at 3. First, it points to a state-court judgment dated May 15, 2014. See 5/15/2014 Judgment, Ex. C to Pl.

---

[14] Garner Properties' complaint presents its malicious prosecution claim without specifying federal or state law. See Compl. ¶¶ 97-102. It later notes rental property owners' "Fourth Amendment rights against unreasonable searches and malicious prosecutions." Id. ¶ 120.

Resp. (Dkt. 38-3).    Second, Garner Properties points to Garner's affidavit, which lists four cases

in Michigan's 17th District Court in which Garner allegedly prevailed.  <u>See</u> Garner Aff. ¶ 23.

No actual records from these four cases are attached, and they are not readily available online.

This Court agrees with Redford that Garner Properties is bound by Garner's deposition

testimony, in which Garner affirmatively states that Garner Properties never prevailed in any

district court action.  <u>See</u> Garner Dep. Tr. at 69:7-12 ("Q.  So you've had formal hearings.  Have

any of those been resolved against you or Garner Properties?  A.  All.  Q.  All of them.  So you

lost them?  A.  Yes.  And I pay those tickets and I do not recoup them from my clients.").

Garner's affidavit directly contradicts this, stating that he prevailed in four district court cases.

<u>See</u> Garner Aff. ¶ 23.  The affidavit should be disregarded to the extent that it contradicts his

deposition testimony.  <u>See</u> <u>Aerel, S.R.L. v. PCC Airfoils, LLC</u>, 448 F.3d 899 (6th Cir. 2006).

Nor does the May 15, 2014 judgment create a fact question whether Garner or Garner

Properties ever prevailed in a district court action.  The judgment indicates that "[t]he plaintiff

[i.e., Redford] moved to dismiss [the] case."  <u>See</u> 5/15/2014 Judgment; <u>see also</u> Garner Aff. ¶ 22

(stating that Garner was able to informally resolve certain disputes before reaching the district

court).  A voluntary dismissal by the plaintiff does not comprise a resolution of proceedings in

favor of the defendant.  <u>See, e.g.</u>, <u>Ohnemus v. Thompson</u>, 594 F. App'x 864, 867 (6th Cir. 2014)

(citing general principle that resolving a case by mutual agreement of the parties does not

amount to termination in plaintiff's favor).  Summary judgment for Redford is, therefore,

appropriate on Garner Properties' malicious prosecution claims under both federal and state law.

### K.  Municipal Liability

On this point, Redford merely states that there can be no municipal liability under <u>Monell</u>

<u>v. Department of Social Services of City of New York</u>, 436 U.S. 658, 694 (1978), because "there

has been no constitutional violation of Plaintiff's rights by Redford." Def. Br. at 10. Plaintiff responds by assuming that a constitutional violation has occurred and arguing that, because those violations are mandated by ordinances and other repositories of municipal policy, they can fairly be attributed to municipal policy and custom. <u>See</u> Pl. Resp. at 11-12. Defendant's reply brief does not reach this issue.

Indeed, "[t]here can be no liability under <u>Monell</u> without an underlying constitutional violation." <u>Robertson v. Lucas</u>, 753 F.3d 606, 622 (6th Cir. 2014). For the constitutional claims for which Redford is entitled to summary judgment — including Garner Properties' abandoned First Amendment claim, <u>see</u> Pl. Resp. at 33, and the substantive due process claim other than that founded upon the Fourth Amendment — Redford is entitled to summary judgment on the derivative <u>Monell</u> claims. For all other constitutional claims that survive Redford's motion, the <u>Monell</u> claims also survive, because Redford's sole argument was based upon the premise that it was entitled to relief on Garner Properties' underlying constitutional claims.

### L. Statute of Limitations

All agree that some non-zero amount of Redford's alleged wrongful conduct occurred within the limitations period applicable to each surviving cause of action. Redford's argument concerning the statute of limitations, therefore, only seeks to limit the amount of damages available. Given that damages are not yet at issue, and given that this is a putative class action — which might later raise issues affecting damages, such as tolling — this Court declines to decide this issue at this time. Redford's statute-of-limitations argument is rejected without prejudice.

### IV. CONCLUSION

For the reasons set forth above, Defendant Redford's motion for summary judgment (Dkt. 35) is granted in part and denied in part. Specifically, this Court grants Redford's motion on Garner Properties' void-for-vagueness, substantive due process (other than the claim based on the Fourth Amendment), state-law tort, assumpsit, and federal malicious prosecution claims. Summary judgment is denied on Garner Properties' procedural due process, Fourth Amendment, unjust enrichment, and municipal liability claims, as well as the substantive due process claim concerning the portion of the IPMC that allegedly is violative of the Fourth Amendment. This Court will hold an in-person status conference on August 17, 2017, at 3:30 P.M. at the Theodore Levin United States Courthouse, 231 W. Lafayette Boulevard, Courtroom 860, Detroit, Michigan.

SO ORDERED.

Dated: August 8, 2017                           s/Mark A. Goldsmith
     Detroit, Michigan                           MARK A. GOLDSMITH
                                            United States District Judge

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on August 8, 2017.

                                         s/Karri Sandusky
                                         Case Manager